**United States District Court**
For the Northern District of California

1
2
3
4
5        IN THE UNITED STATES DISTRICT COURT
6        FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8  TELEPHIA, INC.,                              No. C 04-03508 SI
9           Plaintiff,                          **ORDER GRANTING IN PART
          vs.                                   PLAINTIFF'S MOTION FOR PARTIAL
10                                              SUMMARY JUDGMENT AND DENYING
   STEVEN CUPPY, et al.,                        DEFENDANTS' MOTION FOR PARTIAL
11                                              SUMMARY JUDGMENT**
           Defendants.
12  _____/
13  STEVEN CUPPY, et al.,
14           Counterclaimants,
          vs.
15  TELEPHIA, INC., et al.,
16           Counterdefendants.
17  _____/

18         On January 27, 2006, the Court heard argument on the parties' cross-motions for partial

19  summary judgment.  Having carefully considered the arguments of counsel and the papers submitted,

20  and for good cause appearing, the Court GRANTS IN PART plaintiff's motion and DENIES

21  defendants' motion.

22

23                                    **BACKGROUND**

24         Plaintiff in this matter, Telephia, Inc., is a company in the "wireless market intelligence

25  business," an industry that "provides market intelligence information to wireless service (cell phone)

26  providers." Second Am. Compl., ¶¶ 4, 13; Def. Answer, ¶ 13. Telephia's services include "collect[ing]

27  and analyz[ing] data on cell phone usage for wireless service providers to help them track the
28

1   performance of their programs, drive adoption and usage of their programs, and make investment

2   decisions." Second Am. Compl., ¶ 4. In 1999, defendant Steven Cuppy formed Criterion Wireless

3   Corp. ("Criterion"), a competitor of Telephia. Def. Counterclaims, ¶ 7. Defendants Scott McCulley and

4   David Simon joined Criterion shortly thereafter as shareholders. *Id.* Collectively, Cuppy, McCulley,

5   and Simon were the sole owners of Criterion. *Id.*

6        During 1999 and 2000, Telephia's primary method of obtaining market share information was

7   through "over the air" ("OTA") technology. Second Am. Compl., ¶ 14; Def. Answer, ¶ 14; Decl. of

8   Aaron M. Rofkahr in Support of Pl. Mot. ("Rofkahr Decl."), Exh. 1, at 1. In 2001, however, two

9   developments threatened to make OTA technology obsolete. First, OTA technology would be

10  "fundamentally useless" with GSM wireless networks, a relatively new wireless standard that was being

11  implemented by many wireless carriers. Rofkahr Decl., Exh. 1, at 1. Second, OTA technology was not

12  compatible with local number portability ("LNP"), a function required by FCC regulations that allowed

13  cell phone users to keep their telephone numbers when they switched wireless carriers. *See id.*, Exh.

14  3, at TELE00074 ("In a post [LNP] environment, the OTA methodology will quickly become obsolete

15  for all wireless technologies.").

16       In 2001, Criterion began developing a new technology to measure market share that would not

17  be as limited as OTA, which it called "Veritas" technology. Second Am. Compl., ¶ 19; Def. Answer,

18  ¶ 19. Veritas relied on three measurement tools, referred to as "Path A," "Path B," and "Path C," to

19  measure market share. Second Am. Compl., ¶ 19; Def. Answer, ¶ 19. Path A, which is not implicated

20  by the current motion, involved querying wireless providers' networks to determine whether a mobile

21  number was assigned or unassigned. Path B used a computer controlled modem to dial mobile

22  telephone numbers to determine if a number was assigned or unassigned. Rofkahr Decl., Exh. 3, at

23  TELE00069. Path C was designed to address the problems presented by LNP. *Id.*, Exh. 6. It involved

24  directly querying the LNP database to determine whether a phone number had been transferred between

25  wireless providers.[1] *Id.*, Exh. 3, at TELE00074. Path C was intended to ultimately supplant Paths A

26

27       [1]The LNP database is maintained by the Number Portability Administration Center ("NPAC"),
the body responsible for receiving requests for the porting of telephone numbers from wireless carriers.
28  NPAC is operated by Neustar, Inc. a third party company with no interest in the telephone business.

2

and B, but it could not be fully implemented until LNP went into effect in November 2003. *Id.*, Exh. 6.

On August 27, 2002, Telephia filed a lawsuit against Criterion, alleging that it had misappropriated Telephia's intellectual property. *Id.*, Exh. 9. As part of a settlement agreement stemming from that lawsuit, Telephia agreed to purchase Criterion from its owners, the defendants in this case. Second Am. Compl., ¶¶ 22, 30; Def. Counterclaims, ¶ 18. On October 31, 2002, Telephia and defendants executed a Securities Purchase Agreement ("SPA") setting forth the governing terms of the purchase. Second Am. Compl., ¶ 30; Def. Answer, ¶ 30.

The SPA provided that Telephia would acquire all outstanding capital stock of Criterion from defendants in exchange for (a) $2 million in cash at closing; (b) promissory notes issued at closing for another $2 million; (c) up to $1.5 million in additional consideration, if certain revenue levels were achieved using Veritas; and (d) royalty payments equal to 7.5% of the revenues generated through Veritas, up to a royalty cap of $4 million. Second Am. Compl., ¶ 19; Def. Answer, ¶ 19. In addition, defendants made a number of warranties and representations in the SPA, generally providing that defendants had not made any misrepresentations about Veritas and that Veritas would perform as promised. *See, e.g.*, Rofkahr Decl., Exh. 5, at § 2.10.

At the time the SPA was executed, defendants also signed employment agreements with Criterion. Def. Counterclaims, ¶ 31. The agreements provided that if defendants were released "without cause," and signed a release of their claims against Criterion, then Criterion would continue to pay defendants their base salary until the year anniversary of the date the employment agreement was signed. Rofkahr Decl., Exh. 43. In April 2004, Simon and McCulley executed amendments to their employment agreements. These amendments contained a similar clause, providing that if Simon and McCulley were terminated without cause, and if they executed a release of all claims against Criterion, Criterion would continue to pay them their salary for three-months after their termination. *Id.*, Exh. 44.

On July 30, 2004, Telephia filed this lawsuit in California state court, claiming that defendants had failed to disclose numerous deficiencies in Veritas, and seeking damages for both breach of contract and fraudulent inducement. The core of plaintiff's complaint was that defendants had made a series of misrepresentations about the quality and feasibility of Veritas. On August 2, 2004, defendants were

United States District Court

For the Northern District of California

1    notified that their employment with Criterion had been terminated and that Telephia was withholding

2    payment on the remainder of the amount due on the promissory notes it had issued in connection with

3    the purchase of Criterion.  Decl. of David Simon in Oppo. to Pl. Mot. ("Simon Oppo. Decl."), Exhs. A,

4    B, C; Decl. of Scott McCulley in Oppo. to Pl. Mot., Exh. A.

5        On August 23, 2004, defendants removed the action to this Court based upon diversity

6    jurisdiction.  They then filed counterclaims for damages and injunctive relief.  Plaintiff now moves for

7    partial summary judgment on its claim that defendants made numerous misrepresentations with regard

8    to Path C, and against defendants' claims for breach of their employment agreements.  Defendants also

9    move for partial summary judgment, seeking to limit the damages that Telephia can recover for any

10   alleged misrepresentations related to Paths B and C, and to establish the amount that remains owed on

11   the promissory notes.

12

13                                    **LEGAL STANDARD**

14       Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

15   admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

16   material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

17   56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of

18   material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, has

19   no burden to negate or disprove matters on which the non-moving party will have the burden of proof

20   at trial.  The moving party need only point out to the Court that there is an absence of evidence to

21   support the non-moving party's case.  *See id.* at 325.

22       The burden then shifts to the non-moving party to "designate 'specific facts showing that there

23   is a genuine issue for trial.'"  *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).  To carry this burden, the non-

24   moving party must "do more than simply show that there is some metaphysical doubt as to the material

25   facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The

26   mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

27   jury could reasonably find for the [non-moving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

28   252 ( 1986).

**United States District Court**
For the Northern District of California

4

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

## DISCUSSION

The parties' summary judgment motions involve three issues: plaintiff's claims for breach of warranty concerning Path B; plaintiff's claims for breach of warranty concerning Path C; and defendants' claims for damages based upon their employment agreement and promissory notes. The Court considers each in turn.

## I.    Plaintiff's Claims Related to Path B

Defendants move for partial summary judgment on plaintiff's claims related to Path B. Their primary argument is that plaintiff cannot recover the expenses it incurred to make Path B "invisible" because plaintiff was aware that Path B was not, and was not intended to be, invisible. In addition, defendants challenge plaintiff's claims of fraud in connection with Path B.

### A.    Expenses Incurred Making Path B "Invisible"

"Path B" was a part of Veritas that collected market share data by using an autodialer to call the cell phones of individual wireless subscribers. It is undisputed that Path B's design made it possible that these cell phones would ring when they were called. *See* Decl. of Neil R. Bardack in Support of Def. Mot. ("Bardack Decl."), Exh. A (stating, in patent application for Veritas, that a call is terminated within several milliseconds if it is answered); Exh. L ("[I]n the case of the call being answered the call is torn down in a fraction of a second . . . ."). It is also undisputed that defendants disclosed this fact to Telephia. Pl. Oppo. Br., at 15 ("Telephia is not arguing that Defendants failed to disclose that Path B could be visible to customers."). Indeed, a test of Path B during due diligence conducted in the presence of Telephia personnel caused the cell phone of Telephia's in-house counsel to ring. Bardack Decl., Exh.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

B, at 130-34.  In the parlance of the parties, such ringing created "visibility" and making arrangements to avoid such ringing during the autodial calls is described by the parties as making Path B "invisible."

Because defendants disclosed that Path B could cause a person's cell phone to ring, defendants argue that they may not be held liable for Telephia's efforts to make Path B invisible.  Defendants argue that Telephia had its own business reasons for wanting Path B to be invisible.  *See, e.g.*, Bardack Decl., Exh. H at 142-43; Exh. BB, at 39 ("Invisibility was something that we defined as an objective of any product that we as Telephia were going to develop and use."), Exh. F, at 45-46.  Thus, they argue that they cannot be held liable for Telephia's decision, after the acquisition had been completed, to reengineer Path B.

Defendants' argument, however, misses Telephia's theory of damages related to Path B. Telephia seeks damages based upon its claim that defendants minimized Path B's risks by making affirmative misrepresentations about the extent of Path B's visibility and the importance of Path B's visibility to Criterion's customers.[2]  Second Am. Compl., ¶¶ 48-51.  Specifically, Telephia alleges that defendants concealed Verizon's concerns about Path B and that they failed to disclose their own research into Path B's visibility.

As to the former allegation, plaintiff points to an August 2002 conference call that defendants held with Verizon.  An email sent from Simon to Cuppy summarizing the call stated that their Verizon contact "does not like dial downs. . . .  A secondary issue was sensitivity to causing nuisance calls to subscribers."  Decl. of Aaron M. Rofkahr in Oppo. to Def. Mot. ("Rofkahr Oppo. Decl."), Exh. 58.  An email sent between defendants two months later, after continuing negotiations between Criterion and Verizon, indicates that visibility remained an issue for Verizon.  *Id.*, Exh. 60.  Although defendants' Verizon contact indicated that "his mind had shifted to a Path B solution," he also expressed concern that "Path B has the issue of completing calls to subscribers."  *Id.*  He was concerned enough to request that defendants "put together some stats about how many calls are actually completed to subscribers."  *Id.*

---

[2]Telephia's second amended complaint also alleges that defendants breached their warranty in the SPA that Path B "complies with all applicable laws, statutes, rules and regulations."  Rofkahr Decl., Exh. 5, at § 2.10(j).  The parties do not discuss this theory of recovery in their motions.

United States District Court

For the Northern District of California

As to Telephia's allegation that defendants failed to disclose their own research into Path B's visibility, Telephia contends that defendants studied the issue in response to Verizon's request for statistics about "how many calls are actually completed to subscribers." In a September 30, 2002, email, defendants informed Verizon that, of 15,000 Path B calls made in a market sample, 6,205 were "assigned" through an answer signal, and 11% – 1,645 – were answered by a real person. *Id.*, at Exh. 61. During October 2003, defendants also internally discussed conducting additional testing to determine if customers would be billed for the Path B calls. *Id.*, Exh. 62. Defendants, however, maintain that this testing was never carried out. Decl. of David Simon in Support of Def. Reply ("Simon Reply Decl."), ¶ 4. Defendants never disclosed Verizon's statements nor the test results to Telephia.

Defendants argue that these nondisclosures did not harm Telephia for a two reasons. First, defendants argue that Telephia was aware of Verizon's desire to avoid "nuisance calls," based on its pre-acquisition negotiations with Verizon. In these negotiations, Telephia touted its invisible version of Path B that was under development, and contrasted it with Criterion's visible Path B. Bardack Decl., Exh. CC. Even assuming, however, that Telephia knew that Verizon preferred non-intrusive technology, that knowledge is certainly not the same as the knowledge that Verizon had raised specific concerns about the technology that Telephia was contemplating buying.

Second, defendants argue that Telephia's contract revenues from Verizon increased dramatically from 2003 to 2004, implying that Telephia was not harmed by any nondisclosures. *See id.*, Exh. M, at 45-46. But the mere fact that Telephia's revenues increased does not establish that it was not damaged. Indeed, measuring harm by revenues ignores Telephia's argument that it was damaged by being duped into overvaluing Criterion. *See* Second Am. Compl., ¶ 50.

Thus, the Court finds that material issues of fact remain regarding whether plaintiff may recover the expenses it incurred making Path B invisible. Accordingly, the Court DENIES defendants' motion for partial summary judgment with respect to that issue.

**B.     Telephia's Path B Fraud Claim**

Defendants argue that Telephia's fraud claims fail because it cannot establish the elements of reliance, proximate cause, or scienter. *See Hinesley v. Oakshade Town Ctr.*, 37 Cal. Rptr. 3d 364, 368

(Cal. App. 2005) (holding that the elements of fraud are: "(a) a misrepresentation . . .; (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage."). The Court disagrees.

For the reasons discussed above, the Court finds that an issue of fact remains regarding Telephia's reliance on defendants' statements and proximate cause. If defendants concealed concerns they had received from Verizon about Veritas, those omissions may have damaged Telephia by leading it to value Criterion higher than it otherwise would have. As to the issue of scienter, the Court finds that defendants' knowledge of Verizon's concerns, their repeated attempts to assuage those concerns during the due diligence period, and their failure to disclose those concerns to Telephia are sufficient circumstantial evidence of scienter to survive summary judgment. *See Provenz v. Miller*, 102 F.3d 1478, 1489-90 (9th Cir. 1996) ("Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim.").

Thus, the Court DENIES defendants' motion for summary judgment with respect to Telephia's claims for fraud related to Path B.

## II.    Plaintiff's Claims Related to Path C

Plaintiff moves for partial summary judgment on its claims that defendants' statements and omissions concerning Path C breached warranties contained in the SPA. Defendants oppose plaintiff's motion, and move for partial summary judgment on the issue of damages related to Path C.

### A.    Breach of Warranty Claims

Plaintiff claims that defendants breached three warranties in the SPA. Defendants counter that their actions did not breach any warranty, and also argue that plaintiff is barred from bringing its claims because it did not provide notice of the breach within a reasonable time.

### 1.    Failure to Obtain Third-Party Rights

Plaintiff contends that defendants breach two warranty clauses in the SPA by failing to obtain

United States District Court

For the Northern District of California

the third party rights necessary to implement and operate Path C.  The first warranty, § 2.10(k), reads:

> To the knowledge of Criterion and the Securityholders [defendants Cuppy, Simon, and McCulley], Criterion's [Path C Solution]: (i) complies with all applicable laws, statutes, rules and regulations, and Criterion has obtained all third party licenses, privacy permissions and other third party rights necessary for the implementation and operation of such Path C Solution; and (ii) does not require co-operation from a landline carrier.

Rofkahr Decl., Exh. 5, at § 2.10(k).  The second warranty, § 2.10(l), is very similar.  It states that "[Paths A, B, and C] comply with all applicable laws, statutes, rules and regulations, and Criterion has obtained all third party licenses, privacy permissions and other third party rights necessary for the implementation and operation of [Paths A, B, and C]." *Id.* at § 2.10(l).  Plaintiff contends that defendants violated these warranties because they had failed to secure any third party rights necessary to query the LNP database – the critical feature of Path C – at the time the SPA was signed.

Plaintiff's motion focuses on defendants' potential agreement with TSI, a vendor with access to the LNP database.  TSI was the intended route through which Path C would be implemented – defendants discussed their needs with TSI before the acquisition, and obtained a draft contract from TSI that would have allowed Criterion to perform queries of the LNP database.  *See* Rofkahr Decl., Exhs. 20, 21, 22, 23.  In addition, Telephia, TSI, and defendants held a joint conference call on October 29, 2002, to discuss TSI's ability to provide access to the LNP database.[3]  *Id.*, Exhs. 26, 27; Decl. of Neil R. Bardack in Oppo. to Pl. Mot. ("Bardack Oppo. Decl."), Exh. J.  There is no evidence in the record from before the acquisition that defendants discussed access to the LNP database with any other party. *But see* Decl. of David A. Simon in Support of Def. Mot. ("Simon Decl."), ¶ 10 (implying that defendants had discussed LNP database access with nTelos before the acquisition).

Despite the language in § 2.10(k) and § 2.10(l), no agreement with TSI was signed before the acquisition; the parties left the agreement to be finalized later.  In July 2003, however, when Telephia attempted to finalize the TSI contract, TSI rejected its proposal.  Rofkahr Decl., Exh. 33.  TSI's reason for rejecting the agreement was that Neustar, the party that actually maintained the LNP database, did not allow companies that were not telephone carriers to access the database.  *Id.*  Given that the

---

[3]An email sent after the acquisition also confirms that TSI was the intended route through which Path C would operate.  On March 7, 2003, Cuppy sent an email to a number of individuals at Telephia, stating that "[t]here are no barriers to getting the Path C system up and running.  This is a straight vendor/supplier deal with TSI.  Path C does NOT depend on nTelos." Rofkahr Decl., Exh. 29.

United States District Court

For the Northern District of California

agreement with TSI fell through, plaintiff argues that defendants undisputedly breached the SPA.

Defendants raise a number of reasons why they should not be deemed to be in breach of the SPA. Defendants' primary argument is that they had an agreement for LNP access in place with another company, nTelos, at the time the SPA was signed. Defendants also argue that Telephia cannot prove that it relied on any misrepresentation, and that its statements concerning Path C were opinions that cannot form the basis of a breach of warranty action.

### a)       Defendants' oral agreement with nTelos

Defendants, primarily in their own motion for partial summary judgment, argue that they did not breach § 2.10(k) and § 2.10(l) because they never warranted that Path C would be run through TSI. Instead, defendants assert that they had an agreement in place to access the LNP database with nTelos, a provider of telephone services. Simon Decl., ¶ 10 & Exh. A. Defendants further maintain that this agreement was entirely consistent with their representations during due diligence that "Path C requires access to a Host WSP [Wireless Service Provider] as described above or access to TSI or Verisign as described above." Rofkahr Decl., Exh. 18.

While defendants had an oral agreement with nTelos as of the time the SPA was signed, the record does not make the terms of that agreement clear. *See* Decl. of Aaron Rofkahr in Oppo. to Def. Mot. ("Rofkahr Oppo. Decl."), Exh. 45, at 165-67 (identifying nTelos as subject of an unspecified oral agreement). A written draft agreement with nTelos, circulated on August 28, 2002, and later signed on July 23, 2003, appears to memorialize the oral agreement. *See* Simon Decl., ¶ 10 & Exh. A; Bardack Decl., Exh. O. Nowhere in the draft is the LNP database mentioned. *See* Simon Decl., Exh. A. Defendants insist that Criterion's ability to access the LNP database was created by a provision that reads "Criterion's access will be used solely to measure market share, churn and gross adds on wireless networks and for no other purpose. *Id.* They also argue that Telephia has been able to query the LNP database through nTelos on the basis of the agreement. *See* Decl. of Scott McCulley in Support of Def. Mot. ("McCulley Decl."), ¶ 13; Bardack Decl., Exh P. The Court finds it doubtful, however, that the oral agreement with nTelos actually contemplated the ability to perform queries of the LNP database. Rather, it appears that the first time nTelos was considered for LNP access was after the agreement with

TSI fell through. *See supra*, n.2 (discussing March 7, 2003, email); Bardack Decl., Exh. HH (email sent after TSI agreement fell through, discussing possibility of "[l]everaging our current nTelos relationship to explore possibility to do LNP dip via nTELOS connection."). Nonetheless, the Court finds that an issue of material fact remains concerning the content of defendants' oral agreement with nTelos.

Plaintiff argues that, regardless of the content of the agreement, nTelos was not an appropriate company for Path C because it was a "landline carrier." § 2.10(k) of the SPA specifically warranted that Path C "does not require co-operation from a landline carrier." Rofkahr Decl., Exh. 5, at § 2.10(k). nTelos is referred to as a "landline carrier" in two places in the SPA. First, § 2.10(i) of the SPA refers to "an oral agreement entered into between Criterion and a landline carrier," which plaintiff maintains in nTelos. *See* Rofkahr Decl., Exh. 5, § 2.10(i); Rofkahr Supp. Decl., Exh. 45, at 165-67 (identifying nTelos as subject of an unspecified oral agreement). In addition, in Schedule 2.12(b) to the SPA, "Ntelos" is listed under "Landline Telephone Services". Bardack Oppo. Decl., Exh. H. It appears, however, that nTelos has both landline and wireless divisions, and that their agreement with nTelos to implement Path C was made with nTelos's wireless division. *See* McCulley Decl., Exh. A; *see also* Second Am. Compl., ¶ 25 (referring to nTelos as "a regional wireless provider"); Rofkahr Decl., Exh. 18 (referring to nTelos as a "host WSP"); Bardack Decl., Exh. O. Given the conflicting references to nTelos in the SPA and other documents, the Court finds that there is a genuine issue of fact regarding whether nTelos is an appropriate carrier for Path C under the SPA.

Thus, the Court finds that there remain disputed issues of material fact concerning whether nTelos was an appropriate company for Path C, and whether the defendants' oral agreement with nTelos contemplated access to the LNP database.

### b)    Reliance

Defendants also challenge plaintiff's motion for partial summary judgment on the ground that, regardless of whether an agreement with TSI was in place at the time the SPA was signed, Telephia cannot prove that it relied on either § 2.10(k) or § 2.10(l). *See Grinnell v. Charles Pfizer Co.*, 274 Cal App. 2d 424, 440 (1969) (listing reliance as an element of action for breach of express warranty). It is undisputed that both parties were aware that the agreement with TSI was not finalized, and that

1   defendants were therefore in technical breach of § 2.10(k) and 2.10(l), when the SPA was executed.

2   Given that Telephia knew that the warranties were false, defendants argue that Telephia could not have

3   relied on them.

4        Telephia argues that it need not prove reliance because of the terms of the SPA. In § 6.1, the

5   SPA states that "[n]o information or knowledge obtained in any investigation pursuant to this Section

6   6.1 shall affect or be deemed to modify any representation or warranty contained in this Agreement .

7   . . ." Rofkahr Decl., Exh 5, at § 6.1. In addition, § 10.1 of the SPA provides, "No investigation made

8   by or on behalf of the Company [Telephia] with respect to Criterion or the Securityholders shall be

9   deemed to affect the Company Affiliates' . . . reliance on the representations, warranties, covenants, and

10   agreements made by Criterion." *Id.* at § 10.1.[4]

11        The Court believes this contractual language is clear, and that defendants may be held

12   accountable to the warranties in the SPA regardless of plaintiff's reliance on those warranties. Although

13   defendants argue that it would be "condoning a fraud" to allow Telephia to enforce warranties that it

14   knew to be false, the Court finds it no stranger a result than to interpret the SPA in a manner that results

15   in Telephia having insisted on toothless provisions.[5] *Cf.* Cal. Civil Code § 1641 ("The whole of a

16   contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause

---

18      [4]Defendants attempt to avoid these provisions by arguing that Telephia learned that there was
19   no agreement with TSI before due diligence began, rendering the above provisions inapplicable. But
   in this argument defendants refer only to Telephia's knowledge about the need for a third-party
20   agreement with NPAC, not to Telephia's knowledge about whether Criterion had reached an agreement
   with TSI.

21      [5]Defendants argue that California law requires proof of reliance to establish liability for breach
   of an express warranty. In support, defendants cite to *Kazerouni v. De Satnick*, 228 Cal. App. 3d 871
22   (1991). Plaintiff in that case purchased a business, but the sale documents overstated the approximate
   monthly receipts and approximate monthly net profits of the business. Plaintiff learned of the
23   misstatements before the sale was finalized, and went through with the purchase nonetheless. When it
   later sued for breach of express warranty, the trial court made it prove reliance on the misstatement. The
24   appellate court rejected plaintiff's argument that it should not have had to establish reliance and
   affirmed.
     The Court finds that *Kazerouni* is distinguishable from this case. *Kazerouni* only considered the
25   argument whether § 2313 of the California Uniform Commercial Code, which does not require reliance
   to bring a cause of action for breach of express warranty in connection with the sale of goods, should
26   have been extended to the sale. The court did not consider whether a bargained-for, risk-shifting
   provision such as the one at issue in this case should be enforced. In addition, *Kazerouni* did not involve
27   contractual language explicitly addressing reliance such as that found in § 6.1 and § 10.1 of the SPA.
     Thus, the Court rejects' defendants argument that Telephia must prove that it relied on
28   defendants' misrepresentations. *See Pegasus Mgmt. Co. v. Lyssa, Inc.*, 995 F. Supp. 29 (D. Mass. 1998).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

helping to interpret the other."); *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 503 ("The rule's effect, among other things, is to disfavor constructions of contractual provisions that would render other provisions surplusage."). Given the concerns that Telephia had about Path C, the Court believes that its interpretation of the SPA is entirely sensible; the parties reached a bargain where defendants bore the risk of unexpected problems arising with their technology.

### c) Unactionable opinions

Defendants also argue that their statements about future contracts and the implementation of Path C should be deemed as unactionable opinions, and not as facts. *See, e.g.*, *Neu-Visions Sports, Inc. v. Soran/McAdam/Bartells*, 86 Cal. App. 4th 303, 309-10 (2000) ("[A]n actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions."). Defendants have provided no analysis, however, in support of this argument. In the Court's view, the warranties agreed to by defendants do not concern future events. They clearly state that, as of the date of the SPA, "Criterion has obtained all third party licenses, privacy permissions and other third party rights necessary for the implementation and operation of such Path C Solution." Rofkahr Decl., Exh. 5, at §§ 2.10(k), 2.10(l). Thus, the Court rejects defendants' argument that their warranties were merely unactionable opinions.

*     *     *     *     *

Based on the above, the Court finds that there remains an issue of material fact regarding whether the oral agreement between Criterion and nTelos satisfied § 2.10(k) and § 2.10(l) of the SPA. Accordingly, the Court DENIES plaintiff's motion for summary judgment with respect to those sections.

### 2. False Representations to Customers

Plaintiff also contends that defendants breached § 2.10(n)(i)(E) of the SPA, which provides:

The Veritas Technology and each of Criterion's products and services, (i) conforms and complies in all respects with all specifications, documentation, and performance standards . . . set forth in . . . (E) any representation made in writing to any customer of Criterion.

United States District Court

For the Northern District of California

Rofkahr Decl., Exh. 5, at § 2.10(n)(i)(E).  Plaintiff argues that it bargained for this warranty to hold defendants "responsible for any competitive pressures placed on Telephia during the negotiations based on statements that turned out to be false."  Pl. Mot. at 19.  Thus, unlike other warranties, § 2.10(n) is not limited based on defendants' knowledge of the falsity.

In May 2002, Criterion submitted a proposal to Cingular Wireless, through which Cingular could test the functionality of Veritas.  *See* Rofkahr Decl., Exh. 4.  In this proposal, Criterion stated that "[t]he Veritas methodology also supports number portability since it will be possible to do database dips to determine the serving wireless service provider for each MIN [mobile identification number]."  *Id.* at 3.  In addition, in September 2002 Criterion responded to a "Request for Information" from Verizon Wireless.  *Id.*, Exh. 3.  In this packet, Criterion represented that "Veritas will have the ability to perform database queries to the LNP databases through its SS7 functionality."  *Id.*, at TELE00060; *see also id.* at TELE00074 ("Veritas will be able to perform dips of the [LNP] database . . . through its SS7 access.").  Plaintiff argues that these statements were false because, as discussed above, the Veritas method of accessing the LNP database through TSI did not materialize.

The Court finds that plaintiff has not met its burden of establishing that there is no genuine issue of material fact.  Specifically, questions exist concerning whether defendants' prospective statements about the future functionality of Veritas were false.  In its representations to both TSI and Cingular, Criterion did not specify a route through which Path C would conduct queries of the LNP database. While defendants' preferred method of accessing the LNP database through TSI did not materialize, questions persist concerning whether it was possible for Veritas to query the LNP database.  Indeed, Telephia's ability to access the LNP database through Grande Communications and nTelos suggests that Veritas also would have been able to do so.

Accordingly, the Court DENIES plaintiff's motion for summary judgment with respect to its claims that defendants breached § 2.10(n)(i)(E) of the SPA by making false representations to Verizon and Cingular.

### 3.    Concealing Material Information

Telephia's final contention is that defendants concealed material information related to Path C

14

United States District Court

For the Northern District of California

during due diligence, in violation of §§ 2.10(n)(i)(B) and 2.19 of the SPA. The Court does not agree

that defendants breached § 2.10(n)(i)(B), but agrees that defendants breached § 2.19.

**a)** **Section 2.10(n)(i)(B)**

Section 2.10(n)(i)(B) reads in relevant part:

> The Veritas Technology and each of Criterion's products and services, (i) conforms and complies in all respects with all specifications, documentation, and performance standards . . . set forth in . . . (B) any other due diligence materials provided to the Company.

Rofkahr Decl., Exh. 5, at § 2.10(n)(i)(B). In an October 9, 2002, letter, defendants represented to

Telephia that "[a]ll that is required to implement Path C is access to the SS7 network cloud, which is

available to TSI or VeriSign Telecommunications." Rofkahr Decl, Exh. 6, at 2. Plaintiff contends that

this representation violated § 2.10(n)(i)(B) because an NPAC agreement was also required to access the

LNP database.

Defendants argue that the October 9, 2002, document was not "due diligence material" because

it was transmitted before the parties signed a letter of intent. Defendants argue that they fully disclosed

the requirements for Path C in an official due diligence disclosure on October 25, 2002. *See* Rofkahr

Decl., Exh. 18, at SCM 000325. In that document, defendants stated that "Path C requires access to a

Host WSP as described above or access to TSI or Verisign as described above." *Id.*

The Court agrees with defendants that summary judgment is inappropriate on this issue. First,

an issue of fact remains concerning whether the October 9 letter constituted "due diligence material."

The letter was clearly sent during initial negotiations concerning Telephia's acquisition of Criterion, yet

the parties had not yet agreed to proceed with the acquisition. Given that the parties have provided

practically no briefing on this issue, the Court declines to address it in the instant motion. The court also

finds that an issue of fact remains with respect to whether the statements in the October 9 letter qualify

as "specifications, documentation, and performance standards."

**b)** **Section 2.19**

The Court agrees with Telephia that, by representing on October 9, 2002, that the only agreement

required for Path C was an agreement with TSI or Verisign, and by failing to disclose the need for an

NPAC agreement, defendants violated § 2.19 of the SPA.  That section reads:

> No statement, information, representation or warranty of Criterion . . . contained in (i)
> this Agreement . . . and (ii) any material document or other material instrument . . .
> contains any untrue statement of a material fact or omits to state a material fact required
> to be stated therein or necessary to make the statements therein, in the context in which
> such statements are made, not false and misleading.

Rofkahr Decl., Exh. 5, at § 2.19.

On August 14, 2002, an email between the defendants discussed draft agreements that the

defendants had obtained from TSI for access to the LNP database.  Rofkahr Decl., Exh. 23.  This email

specifically noted that, before Criterion could obtain access to the LNP database, it would have to

"execute [an] agreement[] with the industry [NPAC]."  *Id.*  In addition, on August 19, 2002, Simon

forwarded an email to Cuppy from TSI, with the draft TSI agreement attached.  This agreement

specifically states that "[i]n order for TSI to provide and [Criterion] to receive the services described

herein: . . . [Criterion] must execute agreements with the industry Number Portability Administration

Center (NPAC) in each region where [Criterion] operates and accesses ported number data."  *Id.*, Exh.

20.  It is undisputed that defendants never told Telephia of this requirement.  *Id.*, Exh. 15, at 225-28;

Exh. 16, at 191-93.

Defendants raise a host of arguments against the accusation that they violated § 2.19.  First, they

argue that they did not omit any material disclosures because they had a good faith belief, based upon

assurances from TSI, that they would be able to access the LNP database through TSI.  *See* Rofkahr

Decl., Exh. 16, at 193; Simon Oppo. Decl., ¶¶ 3-6.  David Simon discussed "a potential relationship

between Criterion and TSI" with a member of TSI's sales team in July 2002.  Simon Oppo. Decl., ¶

3;Rofkahr Decl., Exh. 21.  In August 2002, Simon held a similar discussion with another member of

TSI.  Simon Oppo. Decl., ¶ 3; Rofkahr Decl., Exh. 22.  Based on both of these discussions, Simon

believed that there would be no impediment to Criterion obtaining access to the LNP database through

TSI.  Simon Oppo. Decl., ¶ 3; Rofkahr Decl., Exh. 22.  The record is unclear, however, regarding

precisely what assurances TSI provided to Simon.  Defendants' position is supported, however, by

emails sent in 2003. After the acquisition, when Simon sought to begin finalizing the contract with TSI,

he noted in an email to TSI that "neither Criterion nor Telephia is presently a wireless service provider,"

16

United States District Court

For the Northern District of California

1  and discussed the "next steps to get Criterion and Telephia links to TSI's [LNP] database in place."

2  Bardack Oppo. Decl., Exh. G.  TSI's response suggested that TSI did not believe it would be a problem

3  for Telephia to access the LNP database.  *Id.*

4        The Court finds that defendants have failed to demonstrate that a genuine issue of material fact

5  exists.  Even assuming that TSI gave defendants assurances that there would be no impediments to

6  signing the contract, defendants both failed to investigate and failed to disclose the requirement that they

7  sign a contract with NPAC.  *See* Rofkahr Decl., Exh. 23 ("[T]he LNP service requires that a member

8  execute agreements with the industry [NPAC].  Who knows what this involves.").  Moreover,

9  defendants disclosed to Telephia the fact that they had received the draft TSI agreement, but did not

10  disclose the existence of the provision requiring a contract with NPAC.  *See* Simon Oppo. Decl., ¶¶ 5-6.

11  The Court finds that such a requirement of third-party approval is a material fact that defendants were

12  required to disclose under the SPA.  *See* Black's Law Dictionary (8th ed. 2004) (defining "material fact"

13  as "[a] fact that is significant or essential to the issue or matter at hand").

14        Next, defendants argue that they were prevented from disclosing the NPAC requirement because

15  of a non-disclosure agreement ("NDA") they had in place with TSI.  Although a copy of the agreement

16  does not appear in the record, defendants maintain that the agreement prohibited them from sharing the

17  draft TSI agreement, and any information derived therefrom, with Telephia.  *See* Simon Oppo. Decl.,

18  ¶ 7; Rofkahr Decl., Exh. 15, at 217-18; Exh. 16, at 191.  Telephia, however, executed its own NDA with

19  TSI on the morning of October 29, 2002.  Decl. of Colleen M. Kennedy in Support of Pl. Reply

20  ("Kennedy Decl."), Exh. 71.  Moreover, defendants were aware of this fact; in an October 28, 2002,

21  email to Telephia about a pending conference call, Steven Cuppy wrote that TSI could not participate

22  in the conference call because it could not "discuss pricing [with Telephia] for connections or the

23  mechanics in setting up a connection without the non-disclosure."  Bardack Oppo. Decl., Exh. C; *see*

24  *also* Def. Oppo. Br., at 4 n.8.  It is undisputed that the conference call took place the following

25  afternoon.  *See* Bardack Oppo. Decl., Exh. J.

26        The Court finds that no material issue of fact remains with respect to the NDA.  Despite the fact

27  that defendants were fully aware that Telephia had an NDA in place with TSI – indeed, despite the fact

28  that Telephia, TSI, and defendants discussed sensitive TSI information in a joint conference call on

1   October 29, 2002 – defendants did not disclose the NPAC requirement of the TSI agreement.  Thus, the

2   Court finds that the NDA between Criterion and TSI did not relieve defendants of their duty to disclose

3   the NPAC requirement under § 2.19 of the SPA.

4        Third, defendants argue that Telephia should have pursued its questions with TSI at the October

5   29, 2002, conference call, because the call was intended "to provide Telephia's technical due diligence

6   team members . . . direct access to TSI."[6]  Def. Oppo. Br. at 4.  Defendants appear to contend that this

7   meeting relieved them of their obligation to disclose details of the TSI contract because the call was

8   intended to explore whether "the proposed use of TSI as a medium to connect to the SS7 networks or

9   the LNP database was viable."  Bardack Oppo. Decl., Exh. E, at 145-146.  Relatedly, defendants argue

10  that because Telephia left this call with "skepticism" about whether Path C would be able to proceed

11  through TSI, its failure to discuss its concerns at the conference call relieved defendants of their

12  disclosure obligations.  *See* Def. Oppo. Br. at 5; Bardack Oppo. Decl., Exh. E, at 202-03; *see also*

13  Bardack Oppo. Decl., Exh. F, at 50-51 (discussing Telephia's understanding that "you had to be a

14  service provider to get access to [the LNP database]"), 58-59 (Borgstrom was "highly suspicious" that

15  LNP database access through TSI would be possible following the conference call).

16       The Court rejects these arguments; § 2.19 placed a clear obligation on defendants to disclose the

17  NPAC requirement that was in the TSI contract.  Nothing in the conference call relieved them of this

18  affirmative obligation.  Indeed, defendants participated in the call, and were therefore fully aware of the

19  fact that the NPAC requirement had not been discussed.  Further, the Court rejects defendants'

20  arguments that Telephia's skepticism of the TSI agreement's viability saves them from liability;

21  Telephia's skepticism is likely the precise reason it had § 2.19 placed into the SPA.  Accordingly, the

22  Court finds that the conference call did not relieve defendants of their disclosure duties under § 2.19.

23

24  _____

25       [6]In a related argument, defendants argue that their duty to disclose the NPAC requirement was
    fulfilled because at the conference call it was decided that TSI would provide Telephia with a draft copy
26  of its agreement.  *See, e.g.,* Simon Oppo. Decl., ¶ 7 ("During the teleconference on October 29, 2002
    . . . it was agreed that TSI itself would provide a copy of the draft agreement along with a proposal for
27  services directly to Telephia."); Bardack Oppo. Decl., Exh J (October 30, 2002, email from Cuppy to
    employees of Criterion and Telephia, stating that "TSI will be following up with Telephia with a
28  proposal").  Defendants have not explained how the agreement that TSI would provide Telephia with
    a draft contract relieved it of its duty to disclose all material facts.

\*   \*   \*   \*   \*

For the reasons discussed above, the Court finds there to be no issues of material fact with respect to whether defendants disclosed that their proposed Path C solution required the approval of NPAC.  Accordingly, the Court GRANTS plaintiff's motion for summary judgment with respect to that claim.

### 4.    Failure to Provide Notice of Breach within Reasonable Time

Defendants argue that plaintiff may not proceed with its claims for breach of the SPA because it failed to provide them with notice that they had breached § 2.19 within a reasonable time after plaintiff learned of the breach.  *See Pollard v. Saxe & Yolles Dev. Co.*, 12 Cal. 3d 374, 379-80 (1974) (finding that claim for breach of "implied warranty of quality" on sale of new construction could not proceed because plaintiffs "knew of the defects for nearly four years before giving notice").  Defendants argue that plaintiff learned of the breach on November 5, 2002, when it received the draft TSI agreement and discovered the NPAC requirement.  Alternatively, defendants argue that plaintiff learned that the TSI contract could not proceed in July 2003.  Despite knowing of the requirement, plaintiff did not provide defendants with any notice of breach until August 2, 2004.  Simon Oppo. Decl, ¶ 12.

The Court rejects defendants' argument.  As an initial matter, the lone case defendants rely upon is distinguishable from this case.  *Pollard* involved a plaintiff who attempted to enforce an *implied* warranty on the sale of new construction.  Defendants have not pointed the Court to a single case in which a California court has applied *Pollard* to an *express* warranty in a contract for the sale of intangible property, such as a business.  Nor has the Court been able to find such a case.  Thus, the Court finds that *Pollard* is inapplicable.  Even if *Pollard* did apply to this case, the amount of time that plaintiff delayed before notifying defendants of their breach is not unreasonable, especially given the fact that defendants worked for plaintiff and were fully aware of the events that transpired concerning Path C.[7]

_____

[7]In a footnote, defendants argue that § 10.5 of the SPA, which required plaintiff to provide written notice of the breach before filing its lawsuit, is a condition precedent that bars plaintiff's suit. Given that defendants have provided absolutely no argument as to how § 10.5 is a condition precedent,

United States District Court

For the Northern District of California

### B.    Damages for Breach of Warranties

Defendants' motion for partial summary judgment also argues that Telephia should not be allowed to recover for damages related to engineering expenses concerning the development of Path L.[8] Defendants argue that they presented Telephia with a valid Path C methodology, where nTelos served as Telephia's access point to the SS7 network and the LNP database.  Thus, defendants argue, because they created a solution for Path C, any additional engineering that Telephia chose to do was not caused by defendants' breach.    The Court finds that summary judgment is inappropriate on this issue. Defendants' argument presupposes that nTelos was an acceptable provider for Path C under the SPA. As discussed above, it has not been established that using nTelos for Path C was consistent with the SPA.  If it was inappropriate to use nTelos for Path C, then damages incurred trying to craft an appropriate Path C solution might be recoverable.  Accordingly, defendants' motion for summary judgment is DENIED on this point.

### C.    Telephia's Path C Fraud Claim

Defendants' motion also seeks dismissal of Telephia's claim for fraud concerning their Path C disclosures, arguing that Telephia cannot prove the scienter element of its fraud claim. The Court agrees with plaintiff, however, that there is sufficient circumstantial evidence of fraud to survive summary judgment.  Defendants received a draft TSI agreement in August 2002, and specifically noted that an NPAC agreement would be required before they could access the LNP database.   Rofkahr Decl., Exh. 20, 23.  Moreover, defendants refused to provide Telephia with a copy of the draft TSI agreement. Their justification for this action – that a non-disclosure agreement was in place between TSI and Criterion – rings hollow given that Telephia signed an NDA with TSI on October 29, 2002, two days before the acquisition was completed.  In addition, defendants attended a conference call with Telephia and TSI, and were aware that the issue of NPAC approval was not disclosed.  The Court finds that

the Court rejects this argument.

---

[8]Following TSI's rejection of Telephia's proposal for access to the LNP database, Telephia engineered an alternative through Grande Communications, a landline carrier based in Texas. Telephia named this alternative route "Path L."

United States District Court

For the Northern District of California

defendants' awareness of NPAC-approval provision, and their failure to disclose that provision despite numerous opportunities to do so, suffices to create an issue of fact with respect to defendants' scienter.

Accordingly, the Court DENIES defendants' motion with respect to plaintiff's fraud claim.

## III.   Defendants' Counterclaims

Finally, both plaintiff and defendant seek summary judgment on certain of defendants' counterclaims.

### A.   Counterclaims for Breach of Employment Agreement

Plaintiff moves for summary judgment against Simon and McCulley's counterclaims that it breached their employment agreements without cause. The definition of "cause" in the employment agreements of all three defendants, however, includes "the Employee's material breach of any representation, warranty, covenant or agreement contained in the Securities Purchase Agreement or fraud in connection therewith." Rofkahr Decl., Exhs. 43, 44.

Given that plaintiff was aware that defendants were in breach of § 2.10(k) and § 2.10(l) when it signed the agreement, the Court does not find the potential breach of those provisions material. The Court does find material, however, defendants' breach of § 2.19 of the SPA. Accordingly, the Court GRANTS plaintiff's motion with respect to Simon and McCulley's counterclaims for breach of employment agreement.

### B.   Counterclaims Based on Promissory Notes

Defendants seek partial summary judgment on the amount that remains to be paid under the three promissory notes that issued to defendants when the SPA was signed, as well as a fourth that issued when the SPA was amended in July 2003. *See* Decl. of Steven J. Cuppy in Support of Def. Mot., Exhs, A-D. The first three notes promised to pay each defendant approximately $666,667.00, while the last promised to pay the three defendants collectively an additional $1.5 million. *Id.* Defendants assert that it is undisputed that Telephia made only six of eight payments under the first three notes, and only four of six payments under the fourth. Thus, defendants contend that Telephia owes them collectively

$533,854.00 on the first three notes and $500,000 on the fourth note, plus interest.

Plaintiff does not contest defendants' numbers, but argues that summary judgment is inappropriate because the SPA gives Telephia an accelerated right of offset. Section 10.2 of the SPA provides:

> The Company may accelerate and offset as payment for Damages any portion or all of the unpaid or paid amounts due under the Promissory Notes or due under the Contingent Consideration or Royalty Consideration as shall equal the amount of such Damages, and such acceleration and offset shall occur at such time as the amount of such Damages is determined.

Rofkahr Decl., Exh. 5, at § 10.2. The Court agrees with plaintiff; defendants' request for summary judgment on the amount owed to defendants "without considering any alleged offsetting claims by Telephia" is confusing because it splits the ultimate issue of damages. Indeed, given Telephia's right of offset, it does not appear that one can speak of the amount owed under the promissory notes without considering Telephia's offsetting claims. Given that the amount of the payments Telephia made to defendants under the promissory notes appears to be uncontroverted, the Court does not agree with defendants that summary judgment would "eliminate unnecessary time and expense at trial." Def. Rep. Br. at 15. Accordingly, defendants' motion for summary judgment is DENIED with respect to the amounts owed on the promissory notes.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART plaintiff's motion (Docket No. 166). Plaintiff's motion is GRANTED with respect to its claims that defendants breached § 2.19 of the SPA, and is DENIED with respect to its claims that defendants breached §§ 2.10(k), 2.10(l), and 2.10(n). Plaintiff's motion is also GRANTED with respect to Simon and McCulley's counterclaims for breach of their employment agreements. Defendants' motion for summary judgment is DENIED (Docket No.179).

**IT IS SO ORDERED.**

Dated: January 31, 2006

SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

22